**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
(Alexandria Division)

| | | |
|---|---|---|
| SURESH BOYAPATI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 1:20-cv-1075 |
| | ) | (AJT/IDD) |
| LOUDOUN COUNTY SCHOOL BOARD, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT LOUDOUN COUNTY SCHOOL BOARD'S BRIEF IN SUPPORT OF MOTION TO DISMISS FILED PURSUANT TO FED. R. CIV. P. 12(b)(6)

COMES NOW the Defendant, LOUDOUN COUNTY SCHOOL BOARD ("School Board" or "the Board"), by counsel, and in support of its Motion to Dismiss the Plaintiffs' Complaint, filed pursuant to Fed. R. Civ. P. 12(b)(6), states as follows:

Plaintiffs' discrimination claim should be dismissed due to their lack standing to challenge admission policies that have not yet been applied to anyone and may not apply to their children for years, if at all. Plaintiffs have not been injured by any policy of practice of LCPS, and their prospect of being injured is wholly speculative. Even if the plaintiffs had standing, they have failed to state a claim for racial discrimination. Plaintiffs mistakenly assert that LCPS's admissions procedure are subject to judicial review under strict scrutiny. That exacting standard is reserved for race-based classifications, which are not alleged and do not exist in this case. Applying the appropriate rational basis test, LCPS's changes to the admissions procedures are rationally related to the government's legitimate and laudable state interest in ensuring that LCPS's publicly funded Academies enroll a qualified, diverse, and intellectually curious student body. The new admissions procedures are plainly permissible under the United Stats and Virginia Constitutions, and Plaintiffs have failed to state a claim in Count I.

Plaintiffs fail to state claims in Counts II and III because the facts are insufficient as a matter of law to support any violation of law under the Virginia Freedom of Information Act ("VFOIA,"), and all action taken by the Board on August 11, 2020 was taken in the public meeting as documented in the public record.

## I.     ALLEGATIONS

Plaintiffs identify themselves as "Concerned Parents" who are residents of Loudoun County and "Parents, Custodians, or Legal Guardians of Middle School aged children in the Loudoun County Public School" ("LCPS") system.  Compl. ¶1. They filed suit against the School Board under Virginia Code § 22.1-87 seeking judicial review of School Board action which occurred on August 11, 2020 at an "Electronic/Video meeting" of the School Board, for alleged violations of their federal and state constitutional rights, and the VFOIA.  Compl. ¶¶ 2, 5, 6, Counts I, II and III.

The Plaintiffs challenge the School Board's decision to change the admissions system and standards for the Loudoun Academies: the Loudoun Academy of Sciences ("AOS") and the Loudoun Academy of Engineering and Technology ("AET"), collectively referred to in the Complaint as the "Academies." Compl. ¶ 5.  The Academies provide advance STEM instruction for Loudoun County high school students enrolled in grades 9 through 12 and the advanced instruction is provided free as part of the LCPS system to qualified students. Compl. ¶¶ 8, 9. Students who attend the Academies participate in a part-time program at the Academies and part-time program at their home or base high schools.  Plaintiffs allege that students who attend the Academies gain an advanced education beyond what can be provided at the students' home high schools and also gain potential benefits in the higher education admissions process.  Compl. ¶ 11.

Prior to August 11, 2020, students who wished to attend the Academies had to complete a multi-phase application process based "almost entirely," on objective criteria, which begins in the

early fall of a student's eighth grade year.  Compl. ¶¶ 12, 13.  In addition, students were required to submit letters of recommendation and meet certain grade and course work requirements.  Compl. ¶ 14, exh. 1.  Among the course work prerequisites was successful completion of Geometry by the end of eighth grade. *Id.*  Phase  I of the process involved taking two tests: the California Critical Thinking Disposition Inventory score test ("CCTDI"), a thirty minute objective test, and the STEM Thinking skills assessment ("STEM Thinking"), a fifty minute objective test.  Compl. ¶¶ 15, 16, 17.  If a student scored well enough in Phase I, that student was invited to participate in Phase II.  Phase II required students to take the California Critical Thinking Skills test ("CCTST-N") and a thirty minute writing skills test.  Compl. ¶¶ 19, 20, exh. 1.  Based on how students performed in Phase I and Phase II, they were notified of admission in March of the following year.  The admissions team did not have access to information about any applicant's gender, race, ethnicity, socio-economic status, special education status or English learner status.  Compl. ¶ 22, exh. 1.

The changes to the application process presented to the School Board on July 21, 2020 included elimination of the CCTDI and CCTST-N tests and implementation of a lottery for finalists.  Compl. ¶ 27. There was opposition from the community, including a petition, objecting to the proposed changes.  Compl. ¶ 28. The School Board thereafter "shifted the focus of changing the Application  process," and details on the new proposed process became available to some members of the LCPS parent community a few days before the August 11, 2020 School Board meeting.  Compl. ¶¶ 29, 30.  Approximately seventy speakers appeared virtually during public comment at the August 11, 2020 School Board meeting.  None of the speakers spoke in favor of changes to the application process.  A presentation of proposed changes to the process and the reasoning behind the changes was provided to the School Board by Dr. Eric Williams ("Williams"), Superintendent of LCPS. Compl.  ¶¶ 30, 31, 32, 33. The data in the Superintendent's presentation relied on one

applicant pool, the fall 2019 applicant pool for the 2020 school year.  Compl. ¶¶ 34, exh. 2.  The Superintendent's presentation included a slide show outlining the changes to the admissions and recruitment process.  There was discussion of a merit based approach to promoting the geographic and socio-economic diversity of students admitted to the Academies and seeking to promote the racial and ethnic diversity of admitted students, specifically black and brown students.  Compl. ¶ 35, exh. 2, p. 2.  Among the proposed changes was the elimination of the Geometry requirement as a prerequisite for application and, instead, Algebra I would be a prerequisite for applying to the AET program, matching the math prerequisite for the AOS program.  Two tests, CCTDI and CCTST-N would be eliminated, the two phase admission process would be reduced to one phase, teacher recommendations were eliminated for only the first year.  There was a new writing assessment prerequisite and students would be compared against their peers within each middle school and selected by a panel of educators in order to ensure at least seventy-five percent of the proportional representation from each middle school were admitted.  Compl. ¶ 42, exh. 2, pp.13-15, 22,40.

After the Superintendent's presentation at the August 11, 2020 meeting, School Board member Serotkin made a motion to refer the proposed changes to an ad hoc committee.  After debate, a vote was taken and the result was 5-4 in favor of referring the changes to an ad hoc committee. Compl. ¶¶ 68, 69, 70. After the vote, School Board chair Sheridan called a fifteen minute recess. When the meeting resumed, School Board member Corbo moved to reconsider the prior motion.  After the motion for reconsideration was passed, motion was made to vote on the proposed Academies admission changes, which was seconded.  School Board member Corbo then voted "no" to referral of the proposed  changes to an ad hoc committee and instead the new admissions process was approved by a 5-4 vote. Compl. ¶¶ 76-79.

Plaintiffs seek a review of the School Board record of the proceedings and challenge the August 11, 2020 School Board action as arbitrary and capricious because the new admissions policies violate their federal Constitutional rights under the Fourteenth Amendment to the U.S. Constitution, and their state Constitutional rights under Article I, § 2 of the Virginia Constitution. Compl. ¶¶ 81-84, 88, 92.  In essence, Plaintiffs allege that the new admissions policies negatively affect those of Asian descent who purportedly make up the majority of enrollees at the Academies. Compl. ¶¶ 86, 94. They seek a declaration that the new policies are unconstitutional, therefore beyond the authority of the School Board, arbitrary, capricious and an abuse of discretion.  Compl. ¶ 99.  In addition, Plaintiffs allege violation of the Virginia Freedom of Information Act ("VFOIA") Section 2.2-3713 claiming that the recess taken during the August 11, 2020 School Board meeting led to an unlawful meeting wherein allegedly two or more members of the School Board met "privately" with member Corbo to convince her to change her vote.  Compl. ¶¶ 107-08.

The School Board moves for dismissal with prejudice of all claims on the grounds that the allegations are insufficient as a matter of law to support any Constitutional violation of the Plaintiffs' rights under the United States or Commonwealth of Virginia Constitution; and the allegations are insufficient as a matter of law to support invalidation of the School Board's action taken on August 11, 2020 due to claimed violation of the VFOIA.

## II.    LAW AND ARGUMENT

### A.    Standard of Review

The Court, in deciding a Rule 12(b)(6) motion, must take all well-pleaded material allegations of a Complaint as admitted and review them in the light most favorable to the Plaintiff. *DeSole v. United States*, 947 F.2d 1169, 1171 (4th Cir. 1991)**.** "[L]egal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled

5

facts for Rule 12(b)(6) purposes." *Nemet Chevrolet Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d. 250, 255 (4th Cir. 2009) (citing *Ashcraft v. Iqbal*, 556 U.S. 662, 677 (2009)). Pursuant to the standard established in *Ashcraft,* compliance with Fed. R. Civ. P. 8(a)(2) requires more than "labels and conclusions," and a Complaint must "state a claim to relief that is plausible on its face." 556 U.S. at 678 (citing *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555, 570 (2007)). Facts that are merely consistent with a defendant's liability are insufficient to state a plausible claim. *Id.*

In *Bell Atlantic Corporation v. Twombly* and *Ashcraft v. Iqbal, supra*, the Court enhanced the burden Plaintiffs must meet in order for their pleadings to survive a Rule12(b)(6) motion. In *Twombly*, the Court rejected the prior standard set forth in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." The Court stated that *Conley's* "no set of facts" standard has "earned its retirement" and the "phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard." *Twombly*, 550 U.S. at 563. Instead, the *Twombly* court stated that Fed R. Civ. P. 8 requires a greater showing - a complaint must present enough facts to state an entitlement to relief that is "plausible" on its face. *Id.* at 570.

In explaining the new standard, the Court in *Twombly* stated, "[w]hile, a complaint attacked by Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a Plaintiff's [Rule 8(a)(2)] obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 544 (citing *Papason v. Allain*, 478 U.S. 265, 286 (1986)). The Court emphasized, "[w]ithout some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim

6

rests." *Twombly*, 550 U.S. at 556 n.3 (citing 5 WRIGHT & MILLER § 1202, at 94-95).  Factual allegations must not only be made, they "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

In *Ashcroft*, the Court expanded on the standard for Rule 12(b)(6) motions to dismiss.  The Court explained that, although it remained true post-*Twombly* that courts ruling on such motions to dismiss must accept the allegations set forth in the complaint as true, this tenet does not apply to legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft*, 556 U.S. at 678. The Court explained that while Rule 8 marks a "departure from the hypertechnical, code-pleading regime of a prior era," it "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.*  Rather, in order to survive a motion to dismiss, a Plaintiff must support the legal conclusions in the complaint with factual allegations sufficient to state a plausible-*not merely possible*-claim for relief. *Id.* at 678-79 (emphasis added).

Normally, in resolving a Rule 12(b)(6) motion, the court does not consider matters outside the pleadings; however, the court may consider documents integral to the Complaint or specifically referenced by it without converting the motion into one for summary judgment. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007). In this case, the court should consider review of the video of the School Board meeting cited by the Plaintiffs in paragraph 35 of the Complaint, not only for the statements identified in that paragraph, but also in support of Defendant's argument that the facts are insufficient as a matter of law to support a right to recovery under Counts I, II or III. In addition, the Court may consider the exhibits attached to the Complaint, which also support the arguments raised herein below by the School Board. Fed. R. Civ. P. 10 (c). The Court may consider not only facts contained in the Complaint, but also those either found in documents referred

7

to in the Complaint or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, and thus properly subject to judicial notice under Fed. R. Evid. 201." *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011) (internal quotations omitted). *See also*, *Blankenship v. Manchin*, 471 F.3d 523, 526 n.1 (4th Cir. 2006); *Philips v. Pitt County Mem. Hosp.*, 572 F.3d 176,180 (4th Cir. 2009).

In Virginia, the power to operate, maintain, and supervise public schools is within the exclusive jurisdiction of school boards. VA. CONST., art. VIII, § 7; *Bristol Va. Sch. Bd. v. Quarles*, 235 Va. 108, 119 (1988). Virginia school boards are "vested by the Virginia Constitution with exclusive authority over supervision of schools." *Collins v. Prince William County Pub. Sch. Bd.*, No. 03-1455-A, 2004 U.S. Dist. LEXIS 28298, *24 (E.D. Va. Apr. 21, 2004), *aff'd unpub'd op.*, 142 F. App'x 144 (4th Cir. June 15, 2005). The Supreme Court of Virginia has recognized that school boards act independently of and should be free from certain interference by other branches of the government. *E.g., Bd. of Supervisors of Chesterfield Cnty v. County Sch. Bd.,* 182 Va. 266, 275 (1944); *Sch. Bd. v. Parham,* 218 Va. 950, 958 (1978).

Plaintiffs' action was filed pursuant to the provisions of Virginia Code § 22.1-87. Compl. ¶ 2. The standard of review is whether the School Board exceeded its authority, acted arbitrarily or capriciously, or abused its discretion. *Id.* "Actions are defined as arbitrary and capricious when they are 'willful and unreasonable' and taken 'without consideration or in disregard of facts or law or without determining principle.'" *Sch. Bd. City of Norfolk v. Wescott,* 254 Va. 218, 224 (1997). Section 22.1-87 provides limited potential relief to a person actually **aggrieved** by School Board action. (Emphasis added). The School Board's action shall be sustained unless the board exceeded its authority, acted arbitrarily or capriciously or abused its discretion. Deference is given to the

8

School Board's decisions and interpretation of their own regulations. *Id.; Johnson v. Prince William County Sch. Bd.*, 241 Va. 383, 386 (1991).  The court does not review the merits of the School Board's decision, and may not second-guess the School Board's judgment. *Sch. Bd. v. McConnell*, 215 Va. 603, 607 (1975).  The court also does not decide whether the duly-elected School Board "made the best decision, a good decision, or even a wise decision. *Lunsford v. Fairfax County Sch. Bd.,* 3 Va. Cir. 389, 390 (Fairfax County 1985).  Rather, the court examines only whether there was a rational, legal and factual basis for the School Board's action. *E.g., McConnell*, 215 Va. at 607.

### B.     Plaintiffs' Lack Standing to Challenge the New Admissions Policies.

Plaintiffs lack standing to challenge admission policies that have not yet been applied to anyone and may not apply to many of them for years, if at all.  Plaintiffs have not been injured by any policy or practice of LCPS, and their prospect of being so injured is wholly speculative. In order to show standing, Plaintiffs must demonstrate (1) that they "have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical;" (2) that "a causal connection [exists] between the injury and the conduct complained of"; and (3) that "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations and quotations omitted).  All three elements—injury, causation, and redressability—must be met in order to establish standing. *Id.* at 561.

For these same reasons, the Plaintiffs are not aggrieved by the School Board's action. "The word 'aggrieved' . . . contemplates a substantial grievance and means a **denial of some personal or property right, legal or equitable, or imposition of a burden or obligation upon the petitioner different from that suffered by the public generally**." *Virginia Beach Beautification Comm'n v. Bd. of Zoning Appeals*, 231 Va. 415, 419-20 (1986) (emphasis added) (citing *Virginia Ass'n Ins.*

*Agents v. Commonwealth*, 201 Va. 249, 253 (1959)) (finding that a nonstock corporation formed to promote beautification of Virginia Beach was not "aggrieved" by the decision to grant variance to height and setback requirements for signs in the city); *Young v. State Corp. Comm'n*, 205 Va. 111, 113 (1964) (holding that insured under policy affected by insurance rate increase was not a "person interested," "party interested" or "party aggrieved" by order of State Corporation Commission revising liability insurance rates); *D'Alessi v. Lukhard*, 5 Va. App. 404, 408 (Va. Ct. App. 1988) (holding that father of alleged sexually abused child was not "aggrieved" and lacked standing to appeal Commissioner of Social Services' decision to expunge name of suspected abuser from central registry)

Plaintiffs are not "aggrieved" as contemplated under the statute just because their children face the possibility of not being admitted to the Academies despite having the same equal opportunity as any other middle school student choosing to apply. They have not been denied a personal or property right, a legal or equitable right, or suffered the imposition of a burden or obligation different from anyone else who chooses to apply for admission.  Plaintiffs cannot point to any federal or state law that gives them the right to send their children to the Academies. "Education, of course, is not among the rights afforded explicit protection under our Federal Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973). While the Virginia Constitution obligates the General Assembly to "provide for a system of free public elementary and secondary schools for all children of school age throughout the Commonwealth," Va. Const., art. VIII, § I, it does not afford the right to attend the school of one's choice, and there is no statute in Virginia that affords such a right.

Plaintiffs lack standing because they have not suffered any actual injury as a result of any policy or practice of the Defendants, and their prospect of being injured is wholly speculative.

10

Plaintiffs assert without stating any supporting facts that LCPS's changes to its eligibility and selection criteria starting this year, for purposes of selecting students for admission to the Academies in the fall of 2021, are targeted to reduce the number of Asian American students at the Academies. As to themselves, Plaintiffs allege only that they are parents, custodians, or legal guardians of middle-school-age (6th-, 7th-, and 8th-grade) children in the LCPS, Compl. ¶ 1, and that, as parents of students of Asian descent, they "are negatively affected by the change in process." *Id.* ¶ 94.

Plaintiffs have not alleged that as individuals their children plan to apply to the Academies, that they have or will meet the past or current eligibility criteria, or that they face imminent injury as a result of the new admissions process. As stated in *Lujan*, "the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured[,]" *i.e.*, "'directly' affected apart from their 'special interest' in th[e] subject." 504 U.S. at 563 (citing *Sierra Club v. Morton*, 405 U.S. 727 (1972)).

Plaintiffs appear to concede what is plain on the face of their Complaint and its attached exhibits—the new admissions policies do not classify and treat applicants differently on account of their race. *See* Compl. ¶¶ 41-42. Rather, Plaintiffs contend that consideration of geography (based on the applicant's middle school) is "a proxy for race" and "a pretext to target and reduce the admission of Asian students to the Academies." Compl. ¶¶ 43, 66. But Plaintiffs' assertion of alleged race-based discriminatory impact is pure speculation.

First, Plaintiffs have not alleged that the modified eligibility criteria create barriers to their potential admission to the Academies. Indeed, Plaintiffs have not alleged that their children even plan to apply to the Academies, much less that they meet the past or current eligibility criteria. Importantly, the modified eligibility criteria were crafted to *reduce* burdens and increase access to the Academies. For example, Algebra I is now the only required math course for eligibility, where

before Geometry was also required.  The changes thus expand the pool of potential applicants, which may result in an increase of the number of Asian American applicants (and applicants of other races) to the Academies.  This race-neutral expansion of the applicant pool does not injure Plaintiffs.

Second, with respect to Plaintiffs' claim that the changes designed to promote geographic diversity are a proxy for discrimination against Asian American applicants, they do not identify the middle schools their children attend, or allege how they each might be affected individually by the changes designed to promote geographic diversity.  More to the point, and as addressed further below, the new admissions process has not yielded any admissions results upon which Plaintiffs may allege discriminatory impact.[1]  *See, e.g., Scott v. Pasadena Unified School Dist.*, 306 F.3d 646, 661 (9th Cir. 2002) (denying standing with respect to a challenged admissions policy that may take race or gender into account under certain circumstances because "the lack of prior implementation of the policy leaves us without a basis upon which to infer that the threat to [Plaintiff] is genuine" and Plaintiff "can establish neither past adverse treatment by an illegal practice nor real and immediate threat that she will be victimized by such a practice in the future").  For these reasons, Plaintiffs lack standing and cannot proceed, much less prevail, in this case.

C.     **LCPS's Admissions Policies Do Not Classify Students By Race, and Strict Scrutiny Does Not Apply.**

Plaintiffs mistakenly assert that LCPS's admissions procedures are subject to judicial review under strict scrutiny.  That exacting standard is reserved for race-based classifications, which are not alleged and do not exist in this case.

---

[1] *See* Compl., Ex. 2 at 16 ("If LCPS implements the recommended merit-based approach to providing greater socio-economic and geographic diversity, the measures may or may not improve the racial/ethnic diversity of the students.").

Applying the appropriate rational basis test, LCPS's changes to its admissions procedures are rationally related to the government's legitimate and laudable state interest in ensuring that LCPS's publicly funded Academies enroll a qualified, diverse, and intellectually curious student body. The new admissions procedures are plainly permissible under the Constitution.

Plaintiffs urge application of strict scrutiny. This is the wrong standard because race is not part of the revised criteria or process. Instead, the revised criteria include enrollment in or completion of Algebra I at the time of application because Algebra I is a prerequisite to the required 9th-grade math course in the Academies. The revised criteria include one standardized test instead of three, keeping the STEM Thinking Skills Assessment, which is related to the STEM curricula in the Academies. The revised writing assessment will measure characteristics—such as motivation, creativity, and perseverance—that are critical to students being successful in the Academies. The revised selection process, which will consider the middle schools that applicants attend, is designed to provide equitable access based on middle school attendance and thus to provide geographic and socioeconomic diversity in the Academies. These changes to the LCPS's admissions process do not involve racial classifications. There are no racially based quotas, caps, plus-factors or tie-breakers. The merit-based, race-neutral criteria and process are properly analyzed under a rational basis framework, under which LCPS's actions easily pass constitutional muster.

While Supreme Court precedent states that "all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized," that standard does not apply to facially neutral policies that do not make distinctions on the basis of race. *Adarand Constructors, Inc. v. Pena*, 515

U.S. 200, 224 (2005).[2]  Even if the admissions process's race-neutral factors correlate with race, that mere relationship is not enough to convert these race-neutral factors into race-based classifications. *See Crawford v. Board of Education*, 458 U.S. 527, 538 (1982) ("[A] distinction may exist between state action that discriminates on the basis of race and state action that addresses, in neutral fashion, race-related matters.")  Plaintiffs cannot show that LCPS's facially race-neutral policies should be subject to the same constitutional scrutiny as race-based classifications, therefore any request for a strict scrutiny analysis should fail.  *See Spurlock v. Metropolitan Government of Nashville*, No. 3:09-CV-00756, 2012 WL 3064251, at *25 (M.D. Tenn. July 27, 2012) ("Because the 2008 re-zoning plan is facially race-neutral and does not make individual classifications based on race, Plaintiffs are unable to trigger strict scrutiny pursuant to *Parents Involved*"), aff'd sub nom., *Spurlock v. Fox*, 716 F.3d 383 (6th Cir. 2013).

Plaintiffs allege that LCPS's recent changes, while not involving race-based classifications, are nonetheless intended to impermissibly advance race-based discriminatory ends.  However, the Supreme Court has considered race-neutral strategies that are employed to accomplish race-conscious goals to be constitutionally permissible and not subject to strict scrutiny.  *See, e.g., Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 789 (2007) (Kennedy, J., concurring) ("These mechanisms are race conscious but do not lead to different treatment based on a classification that tells each student he or she is to be defined by race, so it is unlikely any of them

---

[2] Plaintiffs mis-cite the Virginia Constitution in paragraph 83 of the Complaint.  The quoted equal protection language is from Article I, Section 11.  This provision "is no broader than the equal protection clause of the Fourteenth Amendment to the Constitution of the United States." *Archer v. Mayes,* 194 S.E.2d 707, 711 (Va. 1973); *see also Lee v. York Cty. Sch. Div.,* 418 F. Supp.2d 816, 835 (E.D. Va. 2006).  So the standard and analysis is the same under both constitutions.

would demand strict scrutiny to be found permissible."); *Spurlock*, 716 F.3d at 394-395 ("The only factor that determines a student's school choices is his or her place of residence, regardless of race.… In short, the requirement that legislative classifications be color-blind does not demand demographic ignorance during the policymaking process. One searches in vain for a single pronouncement from any Justice of the Supreme Court, even in dissent, that goes so far as to conclude that the consideration of racial demographic data during the policymaking process amounts to racial classification.")

In limited cases, courts have applied strict scrutiny to race-neutral state actions if the "actions of … officials (1) had a discriminatory effect and (2) were motivated by a discriminatory purpose." *Bradley v. United States*, 299 F.3d 197, 205 (3d Cir. 2002) (*citing Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 262-266 (1977)). Plaintiffs cannot show either that the changes to the admissions process will have a discriminatory effect or that LCPS was motivated by a discriminatory purpose in enacting them. First, stating the obvious, Plaintiffs are unable to prove that the new admissions policies have a disparate impact because the process has yet to yield any admissions results. There is no evidence that these new policies will discriminatorily affect Asian American students. Indeed, it is possible that the new process could yield incoming classes at the Academies with a higher percentage of Asian American students. Courts generally look to Plaintiffs' statistical analyses and expert assessment to establish that state actions have led to a discriminatory effect. *See Lewis v. Ascension Parish Sch. Bd.*, 806 F.3d 344, 359-362 (5th Cir. 2015) ("The discriminatory-impact element of an equal protection claim may be satisfied with statistical evidence.… [I]mportantly, the district court observed that Lewis offered no evidence of statistical significance at trial, and he makes no colorable argument to the contrary on appeal—nor, for that matter, does he cite any case law in support of his contention that his evidence proved discriminatory

15

impact as a matter of law.") Without any admissions results to analyze here, there can be no successful claim of disparate impact.

Plaintiffs also cannot prove that LCPS was motivated by a discriminatory purpose. Trying to manufacture discriminatory intent where none exists, Plaintiffs point to the slide deck that the superintendent used to present the new policies.  Compl. ¶ 75 and Ex. 2 at 2.  In that deck, the superintendent describes the challenged admissions policies as "a merit-based approach to promoting the geographic and socioeconomic diversity of students admitted to [the Academies]."  He then describes other efforts to promote the racial and ethnic diversity of admitted students, "specifically black and brown students," including recruitment and outreach efforts.  *Id.*, Ex. 2 at 2, 24-27.  None of this evidences an intent to disadvantage Asian American students or improperly take race into account.  To the contrary, the superintendent's presentation makes clear that "[s]ocio-economic and geographic diversity have educational value in and of themselves," and "[s]ocio-economic and geographic diversity are NOT being used as a proxy for race/ethnicity."  *Id.*, Ex. 2 at 16.

In *Parents Involved*, Justice Kennedy wrote in his controlling concurrence that, "[i]n the administration of public schools by the state and local authorities it is permissible to consider the racial makeup of schools and to adopt general policies to encourage a diverse student body, one aspect of which is its racial composition. If school authorities are concerned that the student-body compositions of certain schools interfere with the objective of offering an equal educational opportunity to all of their students, they are free to devise race-conscious measures to address the problem in a general way and without treating each student in different fashion solely on the basis of a systematic, individual typing by race." 551 U.S. at 788-789 (internal citations omitted). Adopting strategies without racial classification that are nonetheless aimed at increasing the geographic, socioeconomic, and racial and ethnic diversity of the students at the Academies is

16

consistent with LCPS's broad goal of "offering an equal educational opportunity to all of their students"—not evidence of discriminatory motive warranting the application of strict scrutiny.

Plaintiffs cannot establish either, much less both, of the two requirements for strict scrutiny application to a facially race-neutral policy. Plaintiffs cannot demonstrate the discriminatory effect and disparate impact of an admissions policy that does not prevent them from applying and has yet to yield its first classes at the Academies. Plaintiffs have not shown that LCPS's race consciousness crossed the line into improper racially discriminatory motivation. For these reasons, strict scrutiny does not apply and the new policies are analyzed under rational basis review.

Applying the correct standard, the Court only needs to determine whether LCPS's actions rationally relate to a legitimate state interest. *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam). In general, plans are rationally related to state interests "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications Inc.*, 508 U.S. 307, 313 (1993). LCPS's admissions decisions that are based on curricular requirements, grades, test scores, a writing sample, middle school attendance, and intellectual curiosity all reasonably relate to the legitimate state interest of enrolling a well-qualified and diverse student body in the Academies. Plaintiffs' Count I fails to state a claim for racial discrimination under the United States Constitution or the Virginia Constitution.

**D**.      **Plaintiffs' Fail to State a Claim for Invalidation of School Board Action.**

Plaintiffs' allegations of alleged VFOIA violations are based on the bare assertion that a recess was taken during the August 11, 2020, virtual/video School Board meeting, and one or more persons "contacted" School Board member Corbo to convince her to change her vote. It is clear these are merely conclusory statements based solely on the fact that Ms. Corbo moved for reconsideration, which she was entitled to do, and then upon motion and seconding of the referral motion, voted no

17

to referring the change in policies issue to an ad hoc committee for review.  Here is where review of the video portion of the meeting related to the original vote, recess, motion for reconsideration, and then re-vote on the original motion demonstrates that there are no facts to support invalidation of the August 11, 2020 School Board action.

The video is a matter of public record and can be viewed, as cited by the Plaintiffs, at https://vimeo.com/446846141.  The discussion, motions made, original vote take place between 4:01:12 and 4:02:38 on the video.  There is nothing unusual about anyone's conduct, demeanor, or statements during that time. There is no support for the allegations, or any inferences to be derived therefrom, that the Board Chair, Brenda Sheridan's, calling for a recess after that initial vote was for any untoward reason.  Compl. ¶ 71.  When the meeting reconvened at 4:16, Board Member Corbo's motion for reconsideration was calmly requested, recognized by the Board Chair, and voted on appropriately, and passed. Thereafter, Board Member Serotkin's Motion for Referral to an ad hoc committee was again voted on and failed 5-4, as seen in the video. Ms. Corbo explained why she was moving for reconsideration.  While she thought referring the matter to an Ad hoc committee was a good idea, she also thought that the new policies should be adopted immediately.  No one disputed that and anything to the contrary is pure speculation by the Plaintiffs.

Even if another School Board member called Ms. Corbo during the recess, such contact would not be inconsistent with or in violation of Virginia Code § 2.2-3710 B. which does not prohibit separate contact of a School Board member by another member for the purpose of ascertaining a member's position with respect to the transaction of public business.  More importantly, all motions were made, discussion evidently occurred as seen on the record, and votes were taken in the open meeting, all of which was proper. No facts are pleaded to support the conclusory statements that one or more Board members must have contacted Ms. Corbo, or that she had any discussion with one

or more Board members in a setting which would constitute a "meeting" in violation of Virginia Code § 2.2-3707, and the video does not support the conclusory statements.  Plaintiffs have not, and cannot, state a claim for invalidation of the School Board's action of August 11, 2020.  There is no support for the argument that the Court should invalidate Ms. Corbo's motion for reconsideration and thereby nullify the August 11, 2020 School Board action on the Academies admissions policies. *Nageotte v. Board of Supervisors,* 223 Va. 259, 267-68 (1982) n. 2 (Court denied Plaintiffs' request to invalidate board action discussed in a challenged closed meeting of board members due to the fact that the action was actually voted on in the open meeting that followed. ) Plaintiffs' Counts II and III fail to state claims under state law.

## III.   CONCLUSION

For all the foregoing reasons, and for any additional reasons to be argued at hearing of this matter, Defendant respectfully requests that this Court grand the Motion to Dismiss and dismiss all claims and this suit with prejudice.

**LOUDOUN COUNTY SCHOOL BOARD**

By Counsel

_____/s/_____

Julia B. Judkins, VSB No. 22597
Barbara Notar, VSB No. 76072
Nicole L. Antolic, VSB No. 93038
BANCROFT, McGAVIN, HORVATH & JUDKINS, P.C.
9990 Fairfax Boulevard, Suite 400
Fairfax, Virginia 22030
(703)385-1000 (telephone)
(703)385-1555 (facsimile)
jjudkins@bmhjlaw.com
bnotar@bmhjlaw.com
nantolic@bmhjlaw.com
*Counsel for Defendant Loudoun County School Board*

19

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2020, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF), and delivered copies via fax and mail to the following:

Milton C. Johns, Esquire, VSB #42305
Paul A. Prados, Esquire, VSB #71374
Executive Law Partners, PLLC
4000 Legato Road, Suite 1100
Fairfax, VA 22033
(571) 500-1010 (telephone)
(571) 408-8102 (facsimile)
mjohns@xlpllc.com
pprados@xlppllc.com
*Counsel for Plaintiffs*


_____/s/_____
Julia B. Judkins, VSB No. 22597
BANCROFT, McGAVIN, HORVATH & JUDKINS, P.C.
9990 Fairfax Boulevard, Suite 400
Fairfax, Virginia 22030
(703) 385-1000 (Telephone)
(703) 385-1555 (Facsimile)
jjudkins@bmhjlaw.com
*Counsel for Defendant Loudoun County School Board*