IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SURESH BOYAPATI, *et al.*,     )
                                )
    Plaintiffs,             )
                                )
v.                              )   Civil Action No. 1:20-cv-01075 (AJT/IDD)
                                )
LOUDON COUNTY SCHOOL BOARD,     )
                                )
    Defendant.              )
_____  )

## ORDER

Plaintiffs are thirty-seven concerned parents of Middle School-aged children enrolled in Loudon County Public Schools ("LCPS"). Based on changes to the admissions requirements and selection process for the Loudon Academy of Science ("AOS") and the Loudon Academy of Engineering and Technology ("AET") (together, the "Academies"), Plaintiffs allege that Defendant has violated the equal protection clauses of the federal and Virginia constitutions (Count I), and Virginia's Freedom of Information Act (Counts II and III). Plaintiffs have filed a Motion for Preliminary Injunction to enjoin the changes from being applied to the current admissions process for the Academies' programs beginning in the Fall of 2021. [Doc. No. 2] (the "Motion").

For the foregoing reasons, Plaintiffs' Motion is DENIED.

## BACKGROUND

The unverified Complaint alleges the following:

Plaintiffs are parents, custodians, or legal guardians of Middle School age children in the Loudon County Public School system. Complaint [Doc. No. 1-2] ("Compl.") ¶ 1. In prior school years, eighth grade students who wished to attend the LCPS Academies for high school

1

underwent an application process that involved two phases. Compl. ¶ 15. The first phase involved taking two objective tests. *Id.* ¶¶ 15–17. Students who scored well enough in phase one were invited to participate in phase two. *Id.* ¶ 18. During phase two, students took a third test, as well as a writing skills test. *Id.* ¶¶ 19, 20. Based on their performance at phase two, students were notified of admission in March of the following year. *Id.* ¶ 21. During this application process, students also provided letters of recommendation, and were required to meet certain grade and coursework requirements as part of the application process. *Id.* ¶ 14. The admissions team did not have access to information about any applicant's gender, race, ethnicity, socioeconomic status, special education status, or English learner status. *Id.* ¶ 22.

In July 2020, approximately six weeks before the opening of the 2020–2021 Application Process, the Loudon County School Board ("LCSB") proposed a significant overhaul of the Application Process. Compl. ¶ 26. Most notably, the changes included the implementation of a lottery system for finalists. *Id.* ¶ 27. This lottery system was subsequently abandoned. *Id.* ¶ 29. Plaintiffs opposed these changes, and signed a petition opposing those changes. *Id.* ¶ 28.

On August 11, 2020, the LCSB held a meeting wherein Dr. Eric Williams, the Superintendent of LCPS, presented the proposed changes to the application process and the reasoning behind it. Compl. ¶¶ 30, 33.[1] The data used in the presentation relied on only one applicant pool, the Fall 2019 applicant pool for the 2020 school year. *Id.* ¶ 34.

The changes suggested by LCPS would attempt to address geographic—as measured by representation from the LCPS middle schools—and economically disadvantaged[2]

---

[1] As described in the presentation, the "changes include a merit-based approach to promoting the geographic and socioeconomic diversity of students admitted to the Academy of Science (AOS) and the Academy of Engineering and Technology (AET)." [Doc. No. 3-2] at 3.
[2] Neither the complaint, briefs, nor video of the meeting explains the definition of "economically disadvantaged." At the hearing on the Motion, counsel for Defendant represented that it refers to students whose families qualified for free or reduced lunches.

underrepresentation. The changes would reduce the barriers to apply to the Academies by reducing the number of tests and grades that are required for applicants. Further, the admissions process would be changed through a panel review as follows:

- The Research Office would use the scores from the STEM Thinking Skills Assessment and the Writing Task to develop a profile for each applicant. The profiles created by the Research Office would be provided to the panel in rank order for each middle school and for students from economically-disadvantaged families according to STEM Thinking Skills Assessment scores, with accompanying Writing Assessment scores.
- The profiles would be reviewed by a diverse panel of educators to identify students who will be offered admission to the AET and AOS programs. The panel would be racially and ethnically diverse.
- The selection process would take into consideration the principle of geography/ socio-economic equity. The panel would use its professional expertise in determining those students in each school whose profile suggests the greatest likelihood of success, while also taking into consideration the principle of geography/socio-economic equity. The list would include names that represent at least 75% of expected representation by middle school and for students from economically-disadvantaged families.

[Doc. No. 3-2] at 24. In the presentation, LCPS noted that "[i]f LCPS implements the recommended merit-based approach to providing greater socio-economic and geographic diversity, the measures may or may not improve the racial/ethnic diversity of enrolled students," that "[s]ocio-economic and geographic diversity have educational value in and of themselves," and that "[s]ocio-economic and geographic diversity are NOT being used as a proxy for race/ethnicity." [Doc. No. 3-2] at 17. In his presentation, Dr. Williams also presented information regarding the racial and ethnic makeup of the previous year's applicants and admitted students and noted that "Other changes in admissions and recruitment would seek to promote the racial and ethnic diversity of admitted students, specifically black and brown students." [Doc. No. 3-2] at 3.

3

At the August 11, 2020 meeting, conducted remotely through video,[3] Member Serotkin made a motion to refer the proposed changes to an ad hoc committee. Compl. ¶ 67. LCSB took a vote, and the vote was 5-4 in favor of referring the changes to a committee, which would have prevented the new application process from taking effect this fall. *Id.* ¶¶ 68, 70. Shortly thereafter, Board Chairman Sheridan called a 15-minute recess, following which Member Corbo moved to reconsider the previous motion to refer the changes to committee. *Id.* ¶¶ 71, 76.[4] The motion to reconsider passed, and then LCSB, with Corbo's support, voted against referring the changes to an ad hoc committee, thereby allowing the changes to be implemented for the application process in 2020, for the school year starting 2021. *Id.* ¶¶ 77, 78. Plaintiffs allege that during the 15-minute recess, LCSB had an improper closed meeting during which they convinced Corbo to change her vote. *Id.* ¶¶ 72–75.

Based on these allegations, Plaintiffs claim that the Defendant violated their state and federal constitutional rights to equal protection (Count I), and the Virginia Freedom of Information Act ("FOIA"), Va. Code § 2.2-3713 (Counts II and III).

## LEGAL STANDARD

Federal Rule of Civil Procedure 65 authorizes a federal court to issue temporary restraining orders and preliminary injunctions. In order to receive a preliminary injunction, the moving party must make a clear showing that (1) it is likely to succeed on the merits of its case; (2) it is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of the equities tips in its favor; and (4) an injunction would be in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir.

---

[3] Video of the meeting is available at: https://vimeo.com/446846141.
[4] In the video of the meeting, Member Corbo stated that she moved to reconsider the previous vote because she "was a little bit confused by the motion," and that she wanted the changes implemented this year but also wanted an ad hoc committee to review some of the other changes. *See* https://vimeo.com/446846141 at 4:16.

1997); *see also Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013). The movant must satisfy all four factors. *The Real Truth About Obama, Inc. v. Fed. Elec. Comm'n*, 575 F.3d 342, 351 (4th Cir. 2009) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 19–20 (2008)). Imbedded in these requirements is a threshold showing of Article III standing, and for that purpose plaintiffs must demonstrate (1) that they "have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical;" (2) that "a causal connection [exists] between the injury and the conduct complained of;" and (3) that "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

## ANALYSIS

"[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725 (4th Cir. 2016), *vacated and remanded on other grounds*, 137 S. Ct. 1239, 197 L. Ed. 2d 460 (2017). Courts are therefore permitted to consider the well-pleaded allegations of a complaint and the uncontroverted affidavits submitted in support of a motion for preliminary injunction. *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976) (taking as true the "well-pleaded allegations of respondents' complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction"). Nevertheless, a preliminary injunction is an extraordinary remedy that essentially confers upon a plaintiff the relief it seeks were it ultimately successful on its claim and necessarily requires a firm evidentiary foundation.

At this point, the record is limited. It contains an unverified Complaint [Doc. No. 1-2] and Motion for Preliminary Injunction [Doc. No. 2], with their unsworn allegations, some of

5

which are disputed or refuted by Defendant, attachments to the Complaint and the Motion for Preliminary Injunction, which contain statistics pertaining to admission at the Academies, the presentation delivered at the August 11, 2020 school board meeting, and the video of the August 11, 2020 school board meeting, and a sworn affidavit submitted by Defendant outlining the Academies' admission process. As discussed below, that record is inadequate in material respects for the purpose of carrying Plaintiffs' burden of clearly satisfying the factors necessary to warrant preliminary injunctive relief.

With respect to showing a likelihood of success on the merits of their claims, Plaintiffs contend that the changes to the admissions process are a proxy or pretext for discrimination against Asian students, not socioeconomic or geographic diversity, as the LCSB contends, and therefore are subject to strict scrutiny, which they cannot withstand.[5] In order to prevail on their discrimination and equal protection claim, Plaintiffs must demonstrate more than a disproportionate impact of facially-neutral policies or racial or ethnic consciousness in promoting socio-economic diversity; they must show that the criteria for selection to the Academies were motivated by racial or ethnic animus against that disproportionately impacted group. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977) (noting that a facially-neutral classification can still run afoul of the equal protection clause when it has a racially disproportionate impact *and* plaintiff provides proof that a discriminatory purpose has been a motivating factor in the decision); *see also Spurlock v. Fox*, 716 F.3d 383, 394–95 (6th Cir. 2013) (citing *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 745 (2007)) (rejecting plaintiffs' argument that defendant's admissions plan, which contains no classification based on race, but instead classifies students by their place of

---

[5] At the hearing on the Motion, Plaintiffs conceded that at this point they cannot make the required showing for a preliminary injunction based on the rational relationship test.

residence, is unconstitutional, noting that race-consciousness in policymaking does not implicate strict scrutiny). For similar reasons, policy motivated by geographic diversity is not prohibited unless a pretext for unlawful discrimination. *See Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2212–13 (2016).

In support of their constitutional claim, Plaintiffs principally rely on the following two statements from the school board's presentation:

(1) The statement that "Other changes in admissions and recruitment would seek to promote the racial and ethnic diversity of admitted students, specifically black and brown students." [Doc. No. 3-2] at 3.

(2) The slides demonstrating Racial/Ethnic Underrepresentation at AET and AOS. *Id.* at 11, 12.

Defendant disputes that either of these pieces of evidence demonstrates that a discriminatory purpose has been a motivating factor in its decision to adopt the revised procedures.

None of the revised substantive admissions criteria are based on race or ethnicity. There remains the previously used qualifying grade level, a previously used standardized test, and a previously required writing skills test, albeit one with a different focus on content.[6] Likewise, the criteria used to designate a student as socio-economically disadvantaged does not include race or ethnicity. The major difference in the new selection process is the middle school allocation methodology; and the Plaintiffs' central premise is that Asian students are concentrated in certain middle schools, whose allocated admission spots would be far fewer than the number of Asian students historically admitted to the Academies from those middle schools.

---

[6] The LCSB eliminated two previously used standardized tests on the grounds that they were designed to test students beyond the eighth grade. It also eliminated for the current admissions cycle first semester grades and teacher recommendations given the impact of COVID-19 on school operations. Additionally, a two-phase review process was reduced to a single phase.

But the record does not allow any real assessment of the demographic impact of that allocation method. No data is provided as to the racial or ethnic composition of any particular middle school; and as discussed below in connection with the issue of irreparable harm, it cannot be said at this point what the systemwide impact will be once the new selection system is implemented. For example, the record does not allow any data-based assessments concerning how the demographic makeup of the Academies selected under the new criteria based on student rankings and selection within each middle school would compare with the demographic makeup of the Academies selected under the new criteria based on system-wide rankings and selections. Accordingly, the record is simply inadequate to demonstrate that socio-economic or geographical considerations will have a disproportionate impact or are being used as a pretext or proxy for ethnic or racial discrimination against Asian students. For these reasons, Plaintiffs have failed to carry their burden to make a clear showing of a likelihood of success on the merits of their claims.

As for irreparable harm, Plaintiffs claim that they have suffered, or face imminent threat of, irreparable harm based on Defendant's constitutional violations and also because their children must now apply to other schools in addition to the Academies given the reduced prospects of gaining admission to the Academies. *See* [Doc. No. 3] ("Without preliminary relief from this Court, Plaintiffs' constitutional injury soon will be irreparable. Given the unconstitutional admissions system employed at the Academies, Plaintiffs will be forced to consider whether to attend other high schools or to hope that they may qualify for admission to the Academies the following school year."). It is certainly the case that "the denial of a constitutional right" in its own right "constitutes irreparable harm for purposes of equitable jurisdiction." *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). But as discussed above, Plaintiffs have at this point failed to make a clear showing of any likely constitutional violation;

8

or show how any particular Plaintiff's child will be affected. In that regard, there is insufficient information to determine even which Plaintiffs are parents of eighth graders who plan to apply to the Academies this year, whether any such eighth graders met the past eligibility criteria or meet the new criteria, or what schools they currently attend, and how the new criteria might impact their particular school's population or any particular student within any particular school.[7] And given the low admissions rate to the Academies each year, it also does not appear from the record that admission to one of the Academies was previously so likely that students and parents would not have engaged in the same alternative planning that Plaintiffs now claim imposes irreparable harm. Similarly, the Plaintiffs have failed to make the required showing that the equities weigh in their favor and that a preliminary injunction is in the public interest.

Plaintiffs have also failed to make the required showing for a preliminary injunction based on their Virginia's FOIA claims. The record is silent as to any contact during the recess among the Board members, who were physically separated during that recess; and in any event, the Board, following the recess, voted in public on the motion for reconsideration. Dispositive of this claim is that the facts of this case appear indistinguishable in any material respect from those considered in *Nageotte v. Bd. of Sup'rs of King George Cty.*, 223 Va. 259, 267 & n.2 (1982), which found that, although a closed-session meeting violated Virginia FOIA, invalidating the defendants' actions was not warranted where they took a public vote after those non-public

---

[7] The uncertain impact of the new plan is reflected in the open questions concerning how the Plan would actually operate. As the Court understands the Plan based on the submissions and representations of counsel at the hearing on the Motion, the number of admissions to each Academy would be based on how a particular middle school's population of eighth graders compares with the systemwide population of eighth graders, with each middle school allocated admissions equal in number to 75% of the number of eighth graders representing that middle school's percentage of all systemwide eighth graders. For example, if there were a total of 120 eighth graders within the Loudon County Public School system and Middle School A had 10% of all eighth graders within the school system, or twelve eighth graders, Middle School A would be allocated nine admission spots at each Academy. Unexplained, or unknown, is what happens if a particular middle school does not have enough qualifying students to fill all of its allocated spaces or all of its selected students do not attend the Academy they were admitted to (with some students likely applying to both Academies) or how spots would be filled from the ranks of students not currently within the system, such as home-schooled students.

discussions. Plaintiffs have therefore not demonstrated a likelihood of success on the merits of their Virginia FOIA claim.

Accordingly, it is hereby

ORDERED that Plaintiffs' Motion for Preliminary Injunction [Doc. No. 2] be, and the same hereby is, DENIED.

The Clerk is directed to forward copies of this Order to all counsel of record.

/s/
_____
Anthony J. Trenga
United States District Judge

October 7, 2020
Alexandria, Virginia