IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SURESH BOYAPATI, *et al.*,                )
                                          )
                    Plaintiffs,           )
                                          )
v.                                        )          Civil Action No. 1:20-cv-01075 (AJT/IDD)
                                          )
LOUDOUN COUNTY SCHOOL BOARD,  )
                                          )
                    Defendant.            )
_____)

## MEMORANDUM OPINION AND ORDER

Plaintiffs, parents of middle school aged children in the Loudoun County Public School

System, challenge the constitutionality of Defendant's revised selection process for admission to

the Loudon Academy of Science and the Loudon Academy of Engineering and Technology.

Defendant Loudoun County School Board ("LCSB" or the "Board") has filed a Motion to

Dismiss Plaintiffs' Amended Complaint.  [Doc. No. 23] (the "Motion").  On December 16, 2020,

the Court held a hearing on the Motion to Dismiss, following which it took the Motion under

advisement. Upon consideration of the Defendant's Motion to Dismiss, the memoranda in

support thereof and in opposition thereto, the arguments of counsel at the hearing, and for the

following reasons, Defendant's Motion to Dismiss [Doc. No. 23] is GRANTED.

# I. BACKGROUND[1]

Unless otherwise noted, the following facts are taken from the Amended Complaint [Doc. No. 18] ("Am. Compl."), the Exhibits attached thereto, and the proceedings before the LCSB on August 11, 2020, as reflected in the video recording whose hyperlink is referenced therein, all of which are integral to the Plaintiff's claim:[2]

Plaintiffs are parents, custodians, or legal guardians of middle school-aged children in the Loudon County Public School ("LCPS") system. Am. Compl. ¶ 1. The LCPS system has two high schools that offer advanced instruction in science, technology, engineering and mathematics ("STEM") subjects at the Loudon Academy of Science ("AOS") and the Loudon Academy of Engineering and Technology ("AET") (together, the "Academies") in place of such instruction at students' home high schools. *Id*. ¶¶ 5, 10. Students who attend the Academies participate in a part time program at the Academies and a part time program at their home high schools. *Id*. ¶ 10. To attend the Academies, students must apply and be chosen for admission. On August 11, 2020, the LCSB decided to alter the criteria for admission to the Academies. *Id*. ¶¶ 5, 6.

Before August 11, 2020, eighth grade students who applied to the Academies were required to have maintained at least a C average or better in all subjects in grades six and seven, *see* Am. Compl., Ex. 2 at 21; and have submitted letters of recommendation from eighth grade math and science teachers, *id.*, Ex. 1 at 1, 2. Those who applied to attend AOS were also

---

[1] On September 1, 2020, Plaintiffs filed this case in the Circuit Court of Loudon County, and Defendant removed it to this Court on September 14, 2020. [Doc. No. 1]. On September 22, 2020, Plaintiffs filed a Motion for Preliminary Injunction [Doc. No. 2], which the Court denied on September 30, 2020 after a hearing. [Doc. No. 12]. On September 29, 2020, Defendant filed a Motion to Dismiss the Complaint. [Doc. No. 6]. On October 20, 2020, Plaintiffs filed the Amended Complaint. [Doc. No. 18]; and on November 4, 2020, the Court denied Defendant's Motion to Dismiss the original complaint as moot. [Doc. No. 22]. On November 16, 2020, Defendant filed the now-pending Motion to Dismiss the Amended Complaint. [Doc. No. 23].

[2] *See Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing Fed. R. Civ. P. 10(c)) (stating materials referenced in the complaint may be considered on a motion to dismiss if integral to the allegations of the complaint.).

required to have completed Algebra I by the end of the eighth grade, *id.*, Ex. 1 at 2; those applied to attend AET were required to have completed Geometry by the end of the eighth grade, *id.*, Ex. 1 at 1. Admission to both Academies involved a two phase application process that began in the fall of the student's eighth grade year. *Id.* ¶¶ 13, 15.  The first phase involved taking two objective tests, the California Critical Thinking Disposition Inventory score test (the "CCTDI"), a thirty minute objective test and, beginning in 2019, the STEM Thinking Skills Assessment (the STEM test"), a fifty minute objective test. *Id.* ¶¶ 15–17,*id*, Ex. 2 at 19.  Students who scored well enough in phase one were invited to participate in phase two.  *Id.* ¶ 18.  During phase two, students took a third test, the California Critical Thinking Skills test ("the CCTST-N"), a thirty minute objective test, and a thirty minute writing skills test.  *Id.* ¶ 19, 20;*id.*, Ex. 1 at 1.  Based on their performance in phase two, students were notified of admission decisions in March of the following year.  *Id.* ¶ 21.  The admissions team did not have access to information about any applicant's gender, race, ethnicity, socio-economic status, special education status, or English learner status.  *Id.* ¶ 22.  For 2018, 1,041 students applied to the AET and 1,077 to AOS, from which 150 were admitted to the AET and 120 to the AOS. *Id.*, Ex. 1, at 1, 2.

   In July 2020, approximately six weeks before the opening of the application process for admission to the Academies for the 2021–22 school year, the LCSB proposed a significant overhaul of the selection process for the Academies ("the Plan").  Am. Compl. ¶ 26.   Overall, the changes incorporated into the Plan included the following:

   (1) The previously used two phase selection process would be reduced to one phase.  *Id.* ¶ 42.

   (2) Algebra I, not Geometry, would be a prerequisite for application to AET, thereby matching the existing math prerequisite for the AOS.  *Id.* ¶ 42; *id.*, Ex. 2 at 18.

(3) The STEM test would be the only objective test used, thereby eliminating the previously used CCTDI and CCTST-N tests, which are geared, not to eighth graders, but to students in grades ten and above.[3]  *Id.* ¶ 42; *id.*, Ex. 2 at 19.

(4) Teacher recommendations would be eliminated for the coming year only (due to the pandemic caused by COVID-19). *Id.* ¶ 42; *id.*, Ex. 2 at 23.

(5) All applicants would complete the Writing Assessment (as opposed to only those selected previously for phase two), which would be revised to assess "motivation, perseverance and creativity" through, for example, asking students "how challenges in their lives could be turned into opportunities."  *Id.* ¶ 42.  Responses would be scored by two reviewers using "a rubric developed to assess motivation, persistence, problem-solving and creativity," with a third reviewer scoring any student's response if the scoring by the two reviewers differed by more than a point.  *Id.*, Ex. 2 at 22.  The results of scoring would be reviewed annually "to ensure reliability of scoring across reviewers and to ensure equitable results across students with diverse backgrounds."  *Id.* (emphasis in original omitted).

(6) Those students selected for admission would "include names that represent at least 75% of expected representation by middle school and for students from economically-disadvantaged families."[4] *Id.* at 23.

---

[3] *See* https://vimeo.com/446846141 at 3:33:58 (last visited Feb. 8, 2021).  In addition, the CCTDI website provides: "The CCTDI is calibrated for use with the general adult population including . . . students in grades 10 and above . . . ."  Https://www.insightassessment.com/article/california-critical-thinking-disposition-inventory-cctdi-2 (last visited Feb. 8, 2021).  The CCTST website states: "[CCTST] is a research-based, discipline neutral assessment for undergraduate and graduate level students or comparable population groups." Https://www.insightassessment.com/article/california-critical-thinking-skills-test-cctst-2# (last visited Feb. 8, 2021).
[4] The Plan originally included a lottery system for finalists, which was subsequently abandoned in favor of the 75% geographic allocation system adopted.  Am. Compl. ¶¶ 27, 29.

(7) Once a middle school fills its minimum number of allocated seats at each of the
Academies, the remaining 25% of seats would be filled according to an applicant's
ranking across the LCPS system.  *Id.* ¶ 42; Am. Compl*id.*, Ex. 2 at 23.  As a result, 75%
of each Academy's incoming class would be selected based on the student's ranking
within his or her own middle school, and 25% of each Academy's incoming class would
be selected based on a county-wide ranking of applicants.  [Doc. No. 24] at 3.  Both
ranking processes would seek to ensure that each Academy's class includes at least 75%
of the proportional population of economically disadvantaged students across the LCPS
system.  *Id.*  Towards that end, a profile for each applying student would be developed
from the scores on the STEM test and the Writing Assessment in rank order for each
middle school and also for students from economically-disadvantaged families based on
their STEM test scores, with accompanying Writing Assessment scores.  *Id*, Ex. 2 at 23.
A "racially and ethnically diverse" panel would review the student profiles to decide
which students will be offered admission to the Academies. *Id.*  That process would take
into consideration "the principle of geography/socio-economic equity," and in addition
would "use its professional expertise in determining those students in each school whose
profile suggests the greatest likelihood of success."  *Id.*

(8) The above changes would be accompanied by a program of recruitment and outreach that
would "increase awareness and interest in the Academies . . . with a special emphasis on
increasing applicant and enrollment diversity . . . ."  *Id*., Ex. 2 at 25.  Those efforts would
include "[p]rovid[ing] opportunities for students to engage in high quality experiences
which develop an interest in STEM," "[e]ducat[ing] families about the
Academies . . . and the application process," and "[p]rovid[ing] support for potential
applicants." *Id.*

(9) The admission process for the 2021–22 school year will open on September 1, 2020, and

close on October 23, 2020. *Id*. ¶ 120. Testing will occur on October 31, November 7,

and November 14, 2020, and students will be notified of admission decisions in March

2021. *Id.* ¶¶ 121, 122

The Plan was presented to the LCSB at its August 11, 2020 meeting. Overall the Plan

was characterized as a "merit-based approach to providing greater socio-economic and

geographic diversity " that "may or may not improve the racial/ethnic diversity of enrolled

students" and that "[o]ther changes in admissions and recruitment would seek to promote the

racial and ethnic diversity of admitted students, specifically black and brown students." *Id.*, Ex.

2 at 2, 16.

The LCSB was presented with the following information about the last class admitted to

the Academies and the overall student body from which it was selected:

(1) Students from economically disadvantaged families constituted 20% of the students

within the entire Loudoun County School System, 12% and 14% of the applicants to

AET and AOS respectively, but only 2% of the student population at each of the

Academies, representing only three students at each Academy out of the 424 that applied,

*id.*, Ex. 2 at 3, an admissions rate of only 1.5% at AET and 1.3% at AOS, as compared

with acceptance rates of 9.7% (AET) and 8.1% (AOS) for students from non-

economically disadvantaged families, *id.*, at 6, n. 1. Thirty-seven unadmitted students

from underrepresented middle schools and thirty-two unadmitted students from

economically disadvantaged families had STEM test scores similar to admitted students.

*Id*., Ex. 2 at 12.

(2) Asian students constituted 55% of the students admitted at AET and 82% at AOS, 52%

and 50% of the applicants respectively and 23% of the overall student population;

6

(3) White students constituted 34% of the students admitted at AET and 15% at AOS, 26% and 21% of the applicants respectively and 46% of the overall student population;

(4) Black/African American students constituted 5% of the admitted students at AET and 2% at AOS, 6% and 9% of the applicants respectively and 7% of the overall student population;

(5) Hispanic students constituted 3% of the admitted students at AET and 0% at AOS, 12% and 16% of the applicants and 18% of the overall student population;

(6) Students of two or more races/ethnicities constituted 3% of the admitted students at AET and 1% at AOS, 4% and 3% of the applicants respectively and 1% of the overall student population; and

(7) American Indian students at both Academies constituted 0% of the admitted students, 1% of the applicants for both Academies and 2% of the overall student population.

See id., Ex. 2 at 10, 11.

The LCSB also was presented with the following information concerning the geographic representation at the Academies and the Plan's impact on each middle school relative to previous admission levels:

(1) Relative to the Plan's 75% allocation by location, nine middle schools were underrepresented at AOS,[5] with a total of fifteen admitted students from those underrepresented schools, eight of which had admitted three or fewer students, with a total of nine from those eight schools, as compared to sixty under the Plan; and, at AET, nine schools[6] were underrepresented, with a total of fifty-seven admitted students from

---

[5] The nine middle schools underrepresented at AOS with the (# admitted/# to be admitted) are: Belmont Ridge (6/7); Blue Ridge (1/5); Harmony (2/7); Harper Park (3/7); J. Luptin Simpson (0/7); River Bend (1/7); Seneca Ridge (1/6); Smart's Mill (1/7);and Sterling (0/7).  Am. Compl., Ex. 2 at 4–5.  No data is available for Mercer.  Id. at 5.

[6] The nine middle schools underrepresented at AET with the (# admitted/# to be admitted) are: Farmwell Station (8/9); Harmony (3/8); J. Luptin Simpson (6/9); River Bend (6/9); Seneca Ridge (4/7); Smart's Mill (6/8); Sterling

those underrepresented schools, as compared to eighty-three under the Plan.  *Id.*, Ex. 2 at 4 –8.

(2) At AOS, seven middle schools[7] would have a total of forty-six fewer allocated slots; and nine middle schools[8] would have a total of forty-five additional allocated slots.  *Id.*, Ex. 2 at 3–4.

(3) At AET, four middle schools[9] would have a total of twenty-five fewer allocated slots, nine middle schools[10] would have a total of twenty-six additional allocated slots, and one middle[11] school would experience no change.  *Id.*at 7–9.

The  Amended Complaint does not allege that the LCSB was told, and it does not otherwise allege, the racial/ethnic makeup of any classes selected from any particular middle school or of socio-economically disadvantaged students; and for that and other reasons, the Amended Complaint does not allege facts sufficient to assess the particular demographic impact the Plan may have within each middle school.[12]  However, the Amended Complaint does allege the racial/ethnic makeup of each middle school*, see* Am. Compl., Ex. 6, which, when combined with information alleged to have been provided to the LCSB, shows the following:

---

(3/8); Trailside (7/9); and Willard (14/16).  Am. Compl., Ex. 2 at 4–5.  Data for Mercer, Belmont Ridge, and J. Michael Lupton is unavailable.  *Id.*
[7] Specifically, at AOS: Willard (-17); Stone Hill (-9); Brambleton (-7); Eagle Ridge (-5); Farmwell Station (-3); J. Michael Lunsford (-3); and Trailside (-2). Am. Compl., Ex. 2 at 4–5.
[8] Specifically at AOS: Sterling (+7); J. Lupton Simpson (+7); River Bend (+6); Smart's Mill (+6); Seneca Ridge (+5); Harmony (+5); Blue Ridge (+4); Harper Park (+4); and Belmont Ridge (+1).  Am. Compl., Ex. 2 at 4–5.
[9] Specifically, at AET: Stone Hill (-14); Eagle Ridge (-9); Brambleton (-1); and Harper Park (-1). Am. Compl., Ex. 2 at 7–8.
[10] Specifically, at AET:  Sterling (+5); Harmony (+5); J. Lupton Simpson (+3); River Bend (+3); Seneca Ridge (+3); Smart's Mill (+2); Trailside (+2); Willard (+2); and Farmwell Station (+1)  Am. Compl., Ex. 2 at 7–8.
[11] At AET, Blue Ride Middle School would experience no change.  Am. Compl., Ex. 2 at 7.
[12] For example, the most negatively affected school, Willard Middle School, with seventeen fewer allocated slots at AOS, has 39.1% Asian students and 37.6% White students.  *See* Am. Compl., Ex. 2 at 5; Ex. 6 at 1. Five of the seven negatively affected middle schools at AOS, which also have among the highest percentage of Asian students, have a higher percentage of White students. *See id.*, Ex. 6 at 1.

(1) The seven middle schools negatively affected by the Plan's geographic allocation, with a total of forty-six fewer allocated slots at AOS and twenty-five fewer allocated slots at AET, had the highest levels of Asian students of between 22.8 and 59.3%.[13] Am. Compl., Ex. 6 at 1.

(2) The eleven middle schools positively affected by the Plan's geographic allocation, with forty-five additional allocated slots at AOS and twenty-six additional allocated slots at AET, had the lowest levels of Asian students of between 2.9% and 20.8%.[14]

At the August 11, 2020 meeting, Member Serotkin made a motion to refer the proposed changes to an ad hoc committee. Am. Compl. ¶ 92. The motion passed by a vote of five to four, which would have prevented the Plan from taking effect for the 2021–22 school year. *Id.* ¶¶ 93, 95. Shortly thereafter, Board Chairman Sheridan called a fifteen-minute recess, following which Member Corbo immediately moved to reconsider the previous motion to refer the Plan to a committee. *Id.* ¶ 96, 101.[15] The motion to reconsider passed, and then LCSB, with Member Corbo's support, voted against referring the Plan to a committee. *Id.* ¶¶ 102, 104. Plaintiffs allege that there occurred an off-camera meeting of some or all of the LCSB members during the fifteen-minute recess, which was intended to shield the whipping of votes from public scrutiny on a topic that appeared to have been resolved. *Id.* ¶ 129.

Based on these allegations, Plaintiffs claim the revised admission process for the Academies violates their state and federal constitutional rights to equal protection (Count I) and has been implemented in violation of Virginia Code § 2.2-3713, the Virginia Freedom of

---

[13] *See supra* n., 7 and 9.

[14] *See supra* n., 8 and 10.

[15] In the video of the meeting, Member Corbo stated that she moved to reconsider the previous vote because she "was a little bit confused by the motion," and that she wanted the changes implemented this year but also wanted an ad hoc committee to review some of the other changes. *See* https://vimeo.com/446846141 at 4:16:00 (last visited Feb. 8, 2021).

Information Act ("FOIA") (Count II).  As relief, Plaintiffs ask that the LCSB be enjoined from using the Plan for the 2020 application cycle, directed to use the same process that was used in the previous year, and prohibited from conducting meetings of three or more people without proper notice and public viewing.  *Id*. ¶¶ 125, 126, 131.

## II. LEGAL STANDARD

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint and does not resolve contests surrounding the facts or merits of a claim.  *See Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).  In assessing the motion, the Court must "assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).  Fed. R. Civ. P. 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief;" however, to survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

## III. ANALYSIS

### A.    Standing

As a threshold matter, Defendant argues that Plaintiffs lack standing under either Article III of the U.S. Constitution or as "aggrieved" parents under Virginia Code § 22.1-87.

To show Article III standing, Plaintiffs must demonstrate (1) that they "have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and

particularized . . . and (b) actual or imminent, not conjectural or hypothetical;" (2) that "a causal connection [exists] between the injury and the conduct complained of;" and (3) that "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). LCSB contends that Plaintiffs lack standing because they have not alleged any actual or imminent injury as a result of the admission policy changes. In short, it argues that Plaintiffs' prospects of being injured is speculative, and they will, in fact, experience the alleged injury only if their children are not admitted to the Academies. Plaintiffs argue, in essence, that it is enough that their children are currently or soon will be subject to the revised admission policy, which therefore has a sufficiently direct effect on them to confer standing to raise their constitutional challenges.

In *Parents Involved in Community Schools v. Seattle School District*, 127 S. Ct. 2738 (2007), the U.S. Supreme Court considered whether parents of high school children had standing to challenge a school assignment system that was influenced by race in certain circumstances. Similar to the standing challenge in this case, the Seattle School District argued that the claimed injury was too speculative since their children had not yet been denied admission to a school of their choice because of race, and in fact may never be. The Court found that argument "unavailing":

> The argument is unavailing. The group's members have children in the district's elementary, middle, and high schools . . . and the complaint sought declaratory and injunctive relief on behalf of [parents] whose elementary and middle school children may be 'denied admission to the high schools of their choice when they apply for those schools in the future . . . .' The fact that it is possible that children of group members will not be denied admission to a school based on their race . . . does not eliminate the injury claimed. Moreover, [parents] also asserted an interest in not being 'forced to compete for seats at certain high schools in a system that uses race as a deciding factor in many of its admissions decisions.' As we have held, one form of injury under the Equal Protection Clause is being forced to compete in a race-based system that may prejudice the plaintiff, . . . an injury that the [parents] can validly claim on behalf of their children.

11

*Id*. at 2751 (citations omitted).

As in *Parents Involved,* the Plaintiffs have children within the middle schools of the Loudoun County School system who are currently or will be soon subject to the alleged unconstitutional selection process, as to which they seek declaratory and injunctive relief. *See* Am. Compl. ¶¶ 124, 125, 126, 131. The direct impact of those alleged violations may affect some Plaintiffs and their children sooner than others or in ways that varies among them; but standing is rooted in a "somewhat elastic concept" of imminence, s*ee Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013), and the Court concludes that Plaintiffs have standing to challenge the constitutionality of the selection process currently underway.

Section 22.1-87 allows "aggrieved" persons to challenge the decisions of the school board.[16] Defendant argues Plaintiffs are not "aggrieved" and, as such, cannot bring a claim for violation of § 22.1-87.

For a person to be "aggrieved," "it must affirmatively appear that such person had some direct interest in the subject matter of the proceeding that he seeks to attack" and the person "must show that he has an immediate, pecuniary and substantial interest in the litigation, and not a remote or indirect interest." *Virginia Beach Beautification Commission v. Board of Zoning Appeals*, 344 S.E. 2d 899, 902 (Va. 1986) The word "aggrieved" "contemplates a substantial grievance and means a denial of some personal or property right, legal or equitable, or imposition of a burden or obligation upon the petitioner different from that suffered by the public generally. *Id.* at 902–903. For the reasons stated above with respect to Article III standing, the

---

[16] Section 22.1-87 provides: "[a]ny parent, custodian, or legal guardian of a pupil attending the public schools in a school division who is aggrieved by an action of the school board may, within thirty days after such action, petition the circuit court having jurisdiction in the school division to review the action of the school board. Va. Code Ann. § 22.1-87.

12

Plaintiff have a sufficiently direct and immediate interest in the admissions determination to be "aggrieved" for the purposes of their claim under Section 22.1-87.

      **B.**      **Whether the Amended Complaint States a Claim upon Which Relief May Be Granted**

            **1. Equal Protection Claim (Count I)**

Plaintiffs allege that the revised admission process violates the Fourteenth Amendment's Equal Protection Clause, which "provides that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'" *Fisher v. King*, 232 F.3d 391, 399 (4th Cir. 2000) (quoting U.S. Const. amend. XIV, § 1).  The clause "is essentially a direction that all persons similarly situated should be treated alike." *Id.*  An equal protection violation occurs either (1) when the government explicitly classifies people based on race, or (2) when a law is facially neutral, but its administration or enforcement disproportionately affects one class of persons over another and a discriminatory intent or animus is shown. *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 818–19 (4th Cir. 1995); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).  For this reason, even a facially-neutral classification can run afoul of the equal protection clause; and in either case, government action must withstand strict scrutiny. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 309 (2013) ("*Fisher I*").  "Strict scrutiny requires the [school] to demonstrate with clarity that its 'purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary . . . to the accomplishment of its purpose.'" *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2208 (2016) ("*Fisher II*") (quoting *Fisher I*, 570 U.S. at 309).

Plaintiffs contend that even though the revised admission procedures are facially-neutral, they have a disproportionate impact on Asian students and are being used as a proxy for racial and ethnic discrimination; and therefore strict scrutiny applies.  Defendant contends, on the other

hand, that the Plan is based on race-neutral selection criteria that take into account only a student's residence, not racial identity, and while LCSB was cognizant, and indeed hopeful, that the new admission policy might increase the racial/ethnic diversity of the Academies, the criteria used do not warrant strict scrutiny but must withstand only rational basis review. Rational basis review assesses "whether the end that the state seeks to achieve is a legitimate governmental purpose." *Sylvia Dev. Corp*, 48 F.3d at 820. If so, the court determines whether the challenged "classification utilized by the statute is 'rationally related'" to that legitimate governmental purpose. *Id.*

As the Plaintiffs concede, the changes to the admission process are facially race/ethnically neutral - the Plan has no racial or ethnic classifications and does not distribute burdens or benefits on the basis of individual racial classifications. *See Parents Involved*, 127 S. Ct. at 2751 ("It is well established that when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny.") Strict scrutiny review of the Plan is therefore not warranted unless there have been alleged facts that make plausible that the revised Plan has a disproportionate impact on Asian students, coupled with a discriminatory intent.

Plaintiffs do not contend that the Plan will have a disproportionate impact on Asian students relative to their representation in the overall student body, that is, that under the Plan Asian students will constitute less than 23% of the those admitted to the Academies. Rather, Plaintiffs contend that the Plan will result in fewer Asian students being admitted than had been admitted under the previously used admissions process. But enrollment decisions for the 2021–22 school year have not been made; and the Plan's actual effect on Asian students system-wide cannot be reasonably predicted, given the large number of unknowns associated with the new selection system, including:

- The number of Asian students from each middle school who will apply and be accepted to both Academies, or to Thomas Jefferson High School for Science and Technology;

- The number of Asian students selected for either, or both, Academies, who decide not to enroll;

- The number of Asian students in historically underrepresented middle schools who will apply and be accepted;[17] and

- The number of Asian students who will be selected through the system wide allocation of 25% of the slots, or roughly thirty slots at AOS and thirty-six slots at AET.

In any event, based on the facts alleged, it is plausible that the new Plan would have a disproportionately negative effect on Asian students, when compared with previous admission levels at certain middle schools. Whether that impact is discriminatory in violation of the Equal Protection Clause reduces to whether any disproportionate effect was the result of a discriminatory intent.

With respect to discriminatory intent, Plaintiffs allege that "[t]he inescapable conclusion from the LCSB presentation is that too many Asian students are admitted to the Academies, and LCPS intends to reduce the number of Asian students enrolled at the Academies, notwithstanding the merit of each of student." Am. Comp. ¶ 52.  In support of this position, Plaintiffs centrally allege that "[t]he proposed geographic diversity is a pretext to target and reduce the admission of Asian students to the Academies." *Id*. ¶ 66.  But Plaintiffs' allegation of discriminatory intent is based almost entirely on the presumed impact of the Plan's 75% geographic allocation of slots, pointing to the high percentage of Asian students at the middle

---

[17] Underrepresented middle schools had Asian student populations of between 2.9% and 20.8%, with a total of forty-five additional allocated slots at AOS and twenty-six additional slots at AET.  *See supra* n. 8 and 10; *see also* Am. Compl., Ex. 2 at 4–5, 7-8; *id.*, Ex. 6.  In addition, one middle school with 39.1% Asian students (Willard) will have a two slot increase to AET. Am. Compl., Ex. 2, at 8; *id.*, Ex. 6.

schools most negatively affected. But as discussed above, the impact on Asian students is uncertain; but in any event, no reasonable inference of discriminatory intent, purpose or animus against Asian students can be drawn from any impact alone. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 97 S. Ct. 555, 563 (1977) (stating "official action will not be held unconstitutional solely because it results in a racially disproportionate impact").

Nor can discriminatory intent be reasonably inferred from either the purpose or substance of the non-geographic selection criteria embedded within the Plan. As presented to the LCSB at the August 11, 2020, meeting, the primary motivation behind the Plan was to increase at the Academies the number of socio-economically disadvantaged students, which may or may not increase racial and ethnic diversity; and there is nothing in either presentation or the substance of the Plan that suggests otherwise.  In that regard, Dr. Williams pointed out the stark disparities in Academy enrollment among middle schools and between socio-economically disadvantaged students and the rest of the student population and how the revised selection criteria would address those disparities by identifying socio-economically disadvantaged students comparable in promise to those selected under the previous system.

Plaintiffs do not allege that the geographic allocation of slots or the criteria to be used for selection is not reasonably related to the announced goals or is not reasonably related to the academic mission of the Academies, only that it will be more difficult or competitive for Asian students from certain middle schools to be selected under that system.  But even if that were the effect (which is not at all clear), no reasonable inference of discriminatory purpose or intent could be drawn from that alleged outcome.

Plaintiffs point to Dr. Williams' statement at the August 11, 2020 LCSB meeting that "other changes in admissions and recruitment would seek to promote the racial and ethnic diversity of admitted students, specifically black and brown students."  Am. Compl., Ex. A at 2;

*see also* [Doc. No. 27] at 11.  But those outreach and recruitment efforts do not allow the reasonable inference that the Plan was devised to discriminate against Asian students and not to promote socio-economic diversity.  In that regard, the U.S. Supreme Court has made clear that race consciousness in educational policy, in and of itself, is not an impermissible consideration as part of an overall strategy to achieve socio-economic diversity. As Justice Kennedy summarized in his concurring opinion in *Parents Involved*:

> In the administration of public schools by the state and local authorities it is permissible to consider the racial makeup of schools and to adopt general policies to encourage a diverse student body, one aspect of which is its racial composition. If school authorities are concerned that the student body compositions of certain schools interfere with the objective of offering an equal educational opportunity to all of their students, they are free to devise race-conscious measures to address the problem in a general way and without treating each student in different fashion solely on the basis of a systematic, individual typing by race.

> School boards may pursue the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race. These mechanisms are race conscious but do not lead to different treatment based on a classification that tells each student he or she is to be defined by race, so it is unlikely any of them would demand strict scrutiny to be found permissible.

127 S. Ct. at 2792 (internal citations omitted); *see also Doe. Ex. Re.  Lower Merion School District*, 665 F.3d 524, 548 (3rd Cir. 2011) (observing that the Supreme Court "has never held that strict scrutiny should be applied to a school plan in which race is not a factor merely because the decisionmakers were aware of or considered race when adopting a policy").

In sum, there is nothing about the Plan that raises a reasonable inference of discriminatory intent.  Those revisions incorporated into the Plan were not race based and were expressly and objectively associated with expanding the opportunity for a broader, more diverse

segment of the student population to be admitted to the Academies while maintaining the integrity of the advanced offerings at the Academies.

For the above reasons, the Court concludes that the Plan is subject to review based on a rational basis test, under which the Plan clearly passes muster. Defendant's classifications are based on achieving socio-economic and geographic diversity, which are permissible governmental interests, particularly given the deference given to legislating bodies in making these policy decisions. *See Fisher II*, 136 S. Ct. at 2212–13  (noting that even those opposing race-based classifications in school admissions argue that race-neutral alternatives, such as consideration of socio-economic factors and increased outreach to African-American and Hispanic applicants, are permissible); *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 651 (4th Cir. 2020) (holding that "those attacking the rationality of the [policy] have the burden to negative every conceivable basis which might support it").  For the above reasons, Plaintiffs have failed to state a violation of the Equal Protection Clause in Count I of the Amended Complaint.

### 2. Virginia Code § 22.1-87 Claim (Count I)

Plaintiffs also assert in Count I a violation of the Virginia Constitution and Virginia Code § 22.1-87, which states: "[t]he action of the school board shall be sustained unless the school board exceeded its authority, acted arbitrarily or capriciously, or abused its discretion."  Va. Code Ann. § 22.1-87.  "[I]n considering a challenge to a school board's exercise of the supervisory authority granted it by Article VIII, Section 7 of the Virginia Constitution," the decision "will not be disturbed by the courts unless the board acted in bad faith, arbitrarily, capriciously, or in abuse of its discretion, or there is no substantial evidence to sustain its action." *Sch. Bd. of City of Norfolk v. Wescott*, 254 Va. 218, 222 (1997) (internal quotation marks omitted).  A school board's actions are arbitrary and capricious when they are "willful and

18

unreasonable," taken "without consideration or in disregard of facts or law or without determining principle." *Id.* at 224. "[T]hose attacking the rationality of the [policy] have the burden to negative every conceivable basis which might support it." *Int'l Refugee Assistance Project*, 961 F.3d at 651.

Plaintiffs argue that the geographic information used to formulate the new admission policy is not geared toward promoting the geographic and socio-economic diversity of students admitted to the Academies, but, rather, toward increasing other minority, and decreasing Asian, student enrollment in the Academies and, as such, the new policy is inherently arbitrary and capricious. For essentially the same reasons stated with respect to Plaintiffs' Equal Protection claim, these allegations do not plausibly allege that the LCSB acted arbitrarily or capriciously or abused its discretion in enacting the Plan.

### 3.     Virginia Code § 2-2.3713 Claim (Count II)

Plaintiffs allege that the LCSB held an illegal closed meeting during a recess of the public meeting on August 11, 2020. Specifically, Plaintiffs allege that "[d]uring the recess the members whose votes did not prevail contacted Member Corbo and convinced her to change her vote" and that "[t]he break was used to have an illegal closed meeting." Am Compl. ¶¶ 98, 99. The Plaintiffs do not allege who specifically participated in the meeting, or how, or any other factual basis for these allegations. In fact, Plaintiffs allege that "the public was not privy to any discussion that occurred during break." *Id*. at ¶ 100. Nevertheless, Plaintiffs allege that the off-camera meeting on August 11, 2020 was used "to shield the whipping of votes from public scrutiny on a topic that appeared to have been resolved." *Id*. at ¶ 129. Based on these conclusory allegations, Plaintiffs allege a violation of Virginia's FOIA and request injunctive relief in the form of an order prohibiting the LCSB from conducting meetings of three or more people without proper notice and public viewing.

19

In their original complaint, based on the same allegation of an illegal closed meeting, Plaintiffs challenged the LCSB's decision to reconsider its earlier vote and approve the Plan after reconvening its August 11, 2020 open meeting following its recess. The Court dismissed that claim based on *Nageotte v. Bd. of Sup'rs of King George Cty.*, 288 S.E. 2d. 423 (Va. 1982).[18] Although they have changed the focus of their claim, Plaintiffs nevertheless claim in substance the same violation that the Court dismissed from the original complaint; and the Court does so again. Even if Plaintiffs had adequately alleged a closed meeting in violation of the Virginia FOIA, that violation would not invalidate the Board's decision to adopt the revised Plan, as the Court previously ruled. Nor does it warrant the imposition of the requested injunction, given the isolated nature of the alleged violation.  A similar request was considered in *Nageotte*, and the Supreme Court of Virginia, considering that the governing body acted in good faith and committed "unsubstantial violations" of the act, declined to enjoin the defendant from any future violations.  *See Nageotte*, 288 S.E. at 428 (reasoning that "a single violation of the Act is sufficient to permit the granting of relief based on the inference that future violations will occur, but such an extraordinary and drastic remedy is not to be casually or perfunctorily ordered and it will not be granted in this case").  Similarly, here, there is alleged only a single, isolated violation, followed by the public consideration of a motion for reconsideration and vote (which presumably, as alleged, was the topic of the alleged closed meeting).  As in *Nageotte,* the alleged closed meeting did not, as a matter of law, invalidate the Board's decision or provide the grounds for the requested injunction.

## IV. CONCLUSION

---

[18] As this Court recited in its Order denying Plaintiffs' Motion for Preliminary Injunction [Doc. No. 12], the Supreme Court of Virginia considered in *Nageotte v. Bd. of Sup'rs of King George Cty.*, 288 S.E. 2d. 423, 427 & n.2 (1982), facts that were indistinguishable in any material respect from those presented here and held that, although a closed-session meeting violated Virginia FOIA, invalidating the defendant's actions was not warranted where defendant took a public vote after those non-public discussions.

For the above reasons, Plaintiffs have failed to state a claim in either Count I or Count II of the Amended Complaint. Accordingly, it is hereby

ORDERED that Defendant's Motion to Dismiss [Doc. No. 23] be, and the same hereby is, GRANTED, and this action be, and the same hereby is, DISMISSED.

The Clerk is directed to forward copies of this Order to all counsel of record.


                                    _____/s/_____
                                    Anthony J. Trenga
                                    United States District Judge

February 18, 2021
Alexandria, Virginia